Railroad Co. v. Sutherland.

---

## MASTER AND SERVANT.

[Huron Circuit Court, April Term, 1894.]

Bentley, Scribner and Haynes, JJ.

†B. & O. R. R. Co. v. SUTHERLAND.

1. INJURY TO COMMON LABORER WORKING UNDER ENGINEER.

Where a person employed by a railroad company as a common laborer or helper, and by the company's orders is placed under the immediate personal charge and direction of a locomotive engineer, known as a "hostler," such engineer is not a fellow servant, but a principal, and the company is liable to an employee who may be injured by his negligence.

2. MANNER OF DOING THE WORK WILL NOT CHANGE RELATIONS OF EMPLOYEES.

The relations of superior and subordinate having been established at the time the service was entered into, the fact that the work in which the men were engaged, the manner of doing it, at the time of the accident, would not alone constitute one superior to the other, will not alter or change the original contract.

3. RELATIONS OF SUPERIOR AND SUBORDINATE.

A master mechanic in the employ of a railroad company, having general authority to hire men, stands in the relation of the company to the men and will be held to have authority to establish the relations between them of superior and subordinate.

ERROR to the Court of Common Pleas of Huron county.

†This judgment was affirmed by the Supreme Court without report, 52 O. S., 676.

HAYNES, J.

The case of The Baltimore & Ohio Railroad Co., plaintiff in error, v. William Sutherland, defendant in error, comes into this court upon petition in error brought for the purpose of reversing the judgment of the court of common pleas in the case wherein William Sutherland was plaintiff and the Baltimore & Ohio Railroad Co. was defendant.

The petition in the court of common pleas sets forth that the defendant is a railroad company, etc., and that the plaintiff on or about January 31, 1882, and for some time prior thereto was, and had been in the employ of the defendant as a common laborer at its coal yard in the village of Chicago Junction, Huron county, Ohio, and that by said defendant's orders, was placed under the immediate personal charge and direction of one Edward Lewis, a locomotive engineer of the defendant, and known as the "hostler," and while in the performance of his duty to said defendant in his said employment, and while strictly obeying the orders and directions of said engineer or "hostler," said engineer so carelessly, negligently and recklessly ran, moved and managed one of the locomotive engines of said defendant that it was then and there run upon and against this plaintiff, breaking and crushing the bones in his right leg, lacerating and tearing the flesh between the knee and the ankle joints, causing him great pain and suffering, and whereby amputation of plaintiff's leg became and was necessary, etc., setting forth the damages and asking for judgment.

To that, there was an answer filed by the company which, in its first defense, says it is a corporation, owning and operating a railroad as therein described, but denies all the averments contained in the petition, and setting up certain matters by way of a second defense which is immaterial perhaps to introduce here. Suit was commenced by the plaintiffs, soon after the injury, and the case, by a curious conjunction of circumstances, has been delayed until a trial was had in the court of common pleas a short time since, and it is now in this court, some twelve years after the time of the accident.

The case was tried to a jury and was very ably contested and was submitted to the jury upon charges given by the court.

There are, I may say, many exceptions noted in the case, some to the admission of evidence, and some to the rejection of evidence, and some to the refusal of the court to charge and some to the charge of the court as given.

The case was tried upon rather different theories which were entertained by the respective counsel for plaintiff and defendant, the counsel for the plaintiff pursuing their line, submitted evidence under what they conceived to be the rules of law as laid down by the Supreme Court of this state governing this class of cases.

The defendant submitted testimony and submitted charges to the court and took exceptions to the charge of the court and the refusal of the court to charge, upon the theory as laid down by the Supreme Court of the United States in *Baltimore & Ohio Railroad Co.* v. *Baugh*, 139, 368.

It is claimed by the counsel for the plaintiff in error here that the decision made by the Supreme Court of the United States does not materially conflict with the decisions that have been made by the Supreme Court of the state of Ohio.

It will be impossible, in the time that is allotted me for the delivery of this opinion to go through with an examination of all the exceptions that have been made in this case; but a discussion of some of the leading principles involved in the case and some of the leading facts, will practically decide the case and will also decide the various exceptions that have been noted in regard to the testimony and the charge of the court.

The petition, it will be observed, alleges that Sutherland went into the employ of the railroad company as a common laborer, but directly to act under the personal charge and direction of one Edward Lewis, a locomotive engineer of the defendant, his petition being substantially that of helper to the "hostler," as he is called. The contention of the plaintiff's attorneys is that, by the terms

of the contract which was made by the direction of the party who employed Sutherland, Lewis became his immediate superior, and in that capacity stood as a representative of the company, and that Sutherland became subordinate to Lewis and was bound to obey his directions and orders and to do as he was asked by Lewis.

The theory of the counsel for the railroad company is, that Lewis was in no sense the superior officer of Sutherland; that he did not stand in the position of a representative of the company, but that some other party was the superior officer, to-wit, the master mechanic.

The first question that is presented for our consideration and the first matter that we ought to examine is as to what theory is the correct one for the government of this case.

I call attention to the case of the *Berea Stone Co.* v. *Kraft*, 31 O. S., 292. That in the case where the laborer in the employ of the Berea Stone Co. had been injured, as was alleged, by the negligence of the foreman. The injury occurred by reason of a certain appliance for lifting stone being too slight and insufficient. This had been attached to a stone by the foreman, who, at that moment, took the place of a common laborer, who was temporarily absent, and after he had attached the apparatus or appliance, the stone was lifted and the car or appliance then broke and the stone fell upon the plaintiff.

In that case the laborer, and it was claimed that inasmuch as the foreman was occupying the position of a common laborer, the company was not liable; that he stood for the time being, at least, in the position of a co-employe of the plaintiff in the case, in the same line of duty and not in a position of control or superiority.

" The court say in that case, that the relation existing between them was such as brings the case clearly within the rule established by repeated adjudications of this court, and how firmly settled in the jurisprudence of the state, that where one servant is placed by his employer in a position of subordination to, and subject to the orders and control of another, and such inferior servant, without fault, and while in the discharge of his duties, is injured by the negligence of the superior servant, the master is liable for such injury."

And they held the company liable. I read that as a statement of the law of Ohio as delivered by the Supreme Court.

The Supreme Court has recently had occasion to examine a case arising in part, at least, under a new section of the law passed April 2, 1890; *R. R. Co.* v. *Margrat*, decided March 13, 1894, 51 O. S., 130. In that case the brakeman of one train in the line of his duty, passing from the locomotive of his train to the rear of his train for the purpose of detaching certain cars, passed upon the main track of the railroad company, claiming that he had a right to do so and practically was compelled to do so because of the icy condition of the road-bed between the tracks that his car was upon, or the train was upon, and the main track, and was injured by being run upon or over by the locomotive in charge of the engineer who had the fireman with him, the fireman who was under him, as was claimed, although that was denied by the railroad company, and this section of the statute was interposed, or cited as ground for holding the railroad company liable; sec. 3:

"That in all actions against the railroad company for personal injury to, or death resulting from personal injury, of any person, while in the employ of such company, arising from the negligence of such company, or any of its officers or employees, it shall be held in addition to the liability now existing by law, that every person in the employ of such company, actually having power or authority to direct or control any other employee of such company, is not the fellow servant, but superior of such other employee; also that every person in the employ of such company having charge or control of employees in any separate branch or department, shall be held to be the superior and not fellow servant employees in any other branch or department, who have no power to direct or control in the branch or department in which they are employed."

The contention of the railroad company was that the engineer of the locomotive was not the person charged with the employee of another branch or depart-

ment, such as would make the company responsible for his action, but that it had reference to some person who had charge of that whole department; for instance, charge of the locomotive department, or the transportation department.

The court, in discussing this matter, make some statements as to the law of Ohio at the time this act was passed. They say:

"This section explicitly declares an intent to preserve the existing liability of railroad companies for the negligence of its employees towards each other, as well as to add to it. The liability that existed before and at the time this action was enacted into a law is, perhaps, as clearly set forth by the cases of *Railroad Co.* v. *Kearney*, 3 O. S., 201, and *Railroad Co.* v. *Lewis*, 33 O. S., 196, as in any of the cases bearing upon the subject to be found in our reports. In the sixth and ninth clauses of the syllabus in the first of the above mentioned cases, this court declared that:

'6. A principal is not liable to one servant in his employ for injuries resulting from the carlessness of another servant, when both are engaged in a common service, and no power or control is given to the one over the other. They stand as equals to each other, and are alone liable for the injuries they may occassion.'                                    .

'9. The agent or officer entrusted with power and control over the subordinates, and the operation of the business, is not engaged in a common service with them, admitting of joint participation; nor is he, in any just sense, their fellow servant; but their employments are separate and distinct, although both are necessary to a successful result in the business.'

While in the second and third clauses of the syllabus, of the latter of the two cases, it states, that:

'2. Where, however, a master places one servant in a position of subordination to another servant, and the subordinate servant without fault, is injured through the negligence of the superior servant, while both are acting in the common service, the master is liable therefor.'

'3. Whether or not one servant is placed by a common master under the control of another servant, thereby creating the relation of superior and subordinate between them, must be determined from the evidence in each particular case.'                                    .

'Now, if the express rules of a railway company or its recognized custom, gives to an engineer in charge of a locomotive authority to direct or control a fireman in the discharge of his duties on the same locomotive, then the relation of superior and subordinate is created between the two; and it would seem that the principles announced in the foregoing syllabi would render the company liable to the latter for an injury resulting to him through the negligence of the former, while both were acting in the common service. The remedy was so complete, where the relation of superior and subordinate actually existed, that the statute here, could have little or no operation. Still, it may be said that the statute makes the rule of liability of certain and universal application, denying any exception to its operation, wherever the relation of subordinate and superior exist, and the subordinate is injured by the negligence of the superior, while engaged in the common service.'

'The relation of superior and subordinate, however, did not actually exist between Margrat and the engineer by whose negligence he was injured; for, as we have seen, the latter had no authority to command or direct the former in the discharge of his duties. But the statute, we think, declares that relation to exist, as matter of law, for the purpose of charging the company, if the engineer was the superior of, that is, was authorized to command or direct, any co-employee whatever, and Margrat was without such authority. They must have been in separate branches or departments of the company's service, for the section, so declares. The section, however, makes no attempt to define the terms, "department" and "branches;" but these terms should not be limited so as to embrace merely, those large divisions, created for convenience in administering the affairs of the company. On the contrary, it is more reasonable to suppose that they relate to those minute ones which concern the daily duties of the employees. Those terms are general and comprehensive; but as the legislature discloses no purpose in this connection, to regulate the internal affairs of a railway company, it should not be presumed to refer to divisions of its business made for its own ends, and if not to such divisions, what divisions could it mean, but those which divide up the employees while in actual service. The section expressly declares a purpose to enlarge the remedy of the employees for accidents occurring in the course of their employment. This declaration emphasizes the presumption that the terms under consideration should be construed as referring to conditions affecting them, rather than to those which are established by the company for its own purpose.'"

We think these statements of the law of Ohio cited, are sufficient to say that the rule of law, as laid down by the Supreme Court of Ohio, is such that, if it be true that Lewis was to have the charge and control of Sutherland, and Sutherland was to be subordinate to him and obey his directions and take his commands from him, it would create a relation of superior and subordinate between Lewis and Sutherland. That is to say, as to Sutherland, Lewis would stand in the position of the company, and would be the representative of the company.

It would seem to us, after a careful reading of this case, cited by counsel in the Supreme Court of the United States, that there is a distinction, a marked difference between the law of Ohio, as laid down by the Supreme Court of Ohio, and the law, as laid down by the Supreme Court of the United States, in the case cited. In short, it seems that the contention that is being made by counsel for the railroad company here, is substantially the contention that was being made in the Margrant case, for the railroad company under the laws of Ohio, and that is, that the person who is to be deemed his superior is really the head of the department, in this case, the master mechanic.

This leaves us to the discussion of the question as to the relation between Sutherland and Lewis as evidenced by the testimony in the case.

I may say here, that the case is not free from doubt and may be said to be a very close case. Nevertheless, we have to take the testimony as we find it in the record and endeavor to give it a fair and just interpretation and to ascertain the result that ought to be arrived at in the case.

As to the employment of Sutherland and the duties that were assigned to him, we have in the main, the testimony of Sutherland alone. Sutherland tells us that he was hired by a man by the name of Gunther, who was called the master mechanic of the shops and who was authorized to employ men. Indeed, it was stated by the counsel for the defendant below, that he admitted that Mr. Gunther was the master mechanic and hired the men and also stated that he hired them and discharged them; that the superintendent of motive power gave him authority to do so, the superintendent of motive power being Mr. Harrison, I believe.

Sutherland says he was employed in January, 1882, that he went to work on January 16th. He was first asked in regard to his position and who employed him and he says it was the master mechanic. He then says, "I asked Mr. Gunther for employment ; he told me he could give it to me at the coal chutes. I asked Mr. Gunther for employment and he told me that he could give me employment at the coal chutes; he told me that Edward Lewis was 'hostler' and that he would instruct me about this work if I would work under his instructions at the chutes."

Q. "What, if anything, did he say about obeying him?" A. "He said that I would give the supplies under his orders, obey him."

Q. "Obey his orders?" A. "Yes, sir."

The testimony then changes to a party that was temporarily acting in the place of Mr. Lewis. He says, he was to go there and work under Mr. Brunbaker until Mr. Lewis would come.

Now, Mr. Sutherland, as I have already stated, is the only party that testifies as to actual conversation between himself and Mr. Gunther. Mr. Gunther, it is said, left the employ of the company, I think the testimony shows that, and is in some other place, where, it is not stated. It is sufficient to say that his testimony has not been taken in any form, so we cannot, or do not, have his version of the case.

We think the testimony of Sutherland fairly shows that when he was employed, he was employed to be an assistant to Mr. Lewis, the "hostler," he was to take his orders from him and receive his instructions from him, to do what he was directed by Lewis to do.

Lewis, as is shown in another part of the testimony, was to receive the locomotives when they were brought in and placed upon the side track and was to see that they were supplied with coal and sand and with water, and to clean out the furnaces and put out the fires, and have them in condition and for preparation to go out again when they should be required to go out.

While the testimony is not very clear upon that point, still it shows that, as we understand the record, Mr. Sutherland was to assist Mr. Lewis in relation to these various matters.

The injury occurred at the coal chutes while the locomotive was receiving coal and the testimony is very largely confined to what transpired at that place, what was done, what orders were being given at that time and at that point.

Some testimony has been offered by witnesses on both sides in regard to the duties of these helpers and in regard to the duties of the hostler. The testimony of Mr. Harrison, the superintendent of motive power, was taken and some of his testimony was received in evidence and some of it was excluded. His testimony was taken for the purpose and was offered as tending to show that Lewis was not a superior officer of Sutherland, that he really had no control over him, that the two were employed in and about a common service and each was pursuing his own particular duties without any special power of the one over the other, in giving orders or directing his actions or movements. Some portion of his testimony was excluded and exceptions were taken; but we might say in passing, that we are unable to see that the court committed any error in doing so. We think there was a marked tendency on the part of Mr. Harrison in giving his testimony, perhaps in some instances, in answer to questions, for him to attempt to testify as a matter of law, what his position and these parties was toward each other, and to place himself in the position of the jury deciding the questions at issue.

It is said here, in relation to this matter by counsel for the railroad company that, although the testimony of Sutherland rather tended to show that Lewis was his superior officer, yet that of itself does not conclude the case; that it is to be shown further that, by the orders and directions of the company and by the rules and regulations of the company, Lewis was directed to become the superior officer of Sutherland, to give him orders and directions as to what he should do.

We are unable to concur in the view that is taken by counsel in that respect and appreciate at least, the full force of the objection. It seems to us that it is sufficient for the purposes of this case to say that if Sutherland was hired as one of the helpers of Lewis, and he was then directed to receive his orders from Lewis and obey his orders, that would place him in the relation of a subordinate to Mr. Lewis. That would fix his position so far as he and the railroad company are concerned.

We may say frankly, that in deciding this case, that if we were to take alone, the testimony of the various witnesses for the plaintiff as to what was done by the parties and their acts in conducting and carrying on the business, we should very seriously doubt whether there was any relation established of superior and subordinate between Lewis and Sutherland.

But the testimony of Sutherland stands here, and stands uncontradicted and evidently has been acted upon by the jury and by them taken to be true and they have returned a verdict which, of course, must find and necessarily does find that Lewis was the superior officer of Sutherland and in that capacity really represented the company.

It is claimed and argued by counsel for the railroad company that, at least in some instances the testimony shows that Mr. Lewis was obeying Mr. Sutherland in the matter of receiving coal at the chutes and in moving the engine.

By looking into that testimony, we find something like this condition of affairs existing. The chutes by which the locomotive received coal have been described. There were two helpers assigned to the assistance of Lewis and their duties were divided something like this: One would go to the coal bin and proceed along the top of the bin and ascertain the amount of coal that was in the bins, if he did not have that information already furnished him, and would give the general direction as to the particular bin out of which the locomotive should receive its coal. Sutherland was to assist in letting down aprons and opening coal chutes and causing the discharge of the coal into the tender of the locomotive. When that was completed, it was customary for him to, at least, assist in closing up the chutes and putting up the aprons so that the locomotive might either pass away entirely from the chutes, or remove to another chute if it was necessary to be done.

The testimony shows that when the helper at the top of these chutes found the proper chute from which the coal was to be taken, he would give notice to

the engineer as to the particular chute to which he was to move his locomotive. Some evidence was given tending to show that when the discharge of the coal was completed, Sutherland would put up the apron and then would give notice to the engineer that the chute was in a condition so that the locomotive could be moved.

Suffice it to say that, in regard to these matters, it seems to us that they don't throw any material light upon the relations of these parties, or materially change the relation that was entered into between them at the time the contract was made.

It must necessarily follow that the engineer, assuming that he was the superior officer, must receive from his subordinate, notice from time to time, of certain facts, certain conditions upon which he would act. This did not throw upon this superior the condition of subordinate by thus directing him what to do. The signals simply operated as a notice from these parties to him of the matters upon which he might act and the conditions under which he might then proceed to move his engine at his will.

Everything is sustained with the general view that the engineer was in charge of his engine or locomotive and was there receiving coal and was to give general directions in regard to the receipt of coal by the locomotive, the amount he should take—the amount needed, and the general purposes to be carried out in taking coal from the chutes.

As I have already stated, what was to be done afterwards by these helpers—how far they were to assist him, except that they were to assist him generally in taking in water and sand and cleaning out the coal ashes, is not very definitely given, but that they were to be his helpers is clearly shown.

Now, it might be very strongly argued, as it has been urged, that these facts alone would not constitute one superior to the other, but as I have already stated, we think, when taken in connection with the original contract, that that testimony would not change the contract, and that the relation of these parties was established at the time the service was entered into—at the time the employment was made.

It is objected that Gunther was not authorized to establish these relations, but the testimony shows, we think, taking the testimony of different parties—that Mr. Gunther was there as master mechanic and general authority was given him to hire men, to determine the number of men, in a general way, by the master of transportation, Mr. Harrison, and in the hiring of the men, in the employment of them, he really stood in the relation of the company to the men. He hired them and he stated to them the terms of the contract.

It does not appear here that Mr. Harrison ever interfered as to the relations established between these parties, nor ever interfered generally in regard to the matter, except it is said that Mr. Gunther could not finally discharge men except by Mr. Harrison's request; nor could he, as a general rule, hire men; but we think that is to be taken in its general sense—that Harrison had general control over his department and had general authority to direct Mr. Gunther as to the number of men he was to employ and that all the details of the matter was committed to Mr. Gunther and that in that relation, his was as completely the act of the railroad company as if Mr. Harrison himself had been present representing the company.

It was claimed that this injury did not occur to Mr. Sutherland by reason of any act of Lewis while he was in the line of his duty. There was a great deal of controversy as to the manner in which this accident occurred and the circumstances and the surroundings. There were four persons who were present at the time of the injury. There was Mr. Sutherland and there was the other helper who was on top of the chutes, but who really heard but very little of the matter; indeed, the only thing that he seems to have heard which was directly connected with, and as the result of the injury, was the outcry that was made by Sutherland at the time that he was injured when he called to the engineer that he was

caught, and that he should move the locomotive ahead. The other party, of course, was Sutherland, that is, as far as the helpers are concerned; and then the other parties were the engineer, Lewis, the "hostler," and the fourth party was a man by the name of George, who was the fireman and who, as the record shows, is dead.

The counsel for the railroad company offered to put witnesses upon the stand, and offered to prove the testimony that was given by Mr. George upon the trial which was commenced in this case and held in the United States court at Toledo.

Objection to that was made by counsel for the plaintiff, and the testimony was ruled out by the court, or rather he was prevented from giving it and the objection was sustained to it. No exception was taken to that, and it simply stands in that manner and form so that we have not the testimony of Mr. George in relation to the matter.

The testimony shows that these parties had received from a certain coal chute—number 11, I think was the number—a certain quantity of coal and the engineer said he needed a little more coal, or some more; thereupon Mr. Sutherland, as was his proper place, said he should move his locomotive to coal chute number 8, and that, in the position which the locomotive occupied at the chute at the time, would necessitate the backing up of the locomotive from number 11 to number 8.

Lewis was in his proper place in the cab of the engine and Sutherland testifies that he, Sutherland, stepped upon the platform or rather the apron of the coal chute with his left foot, placing it upon some bar that ran across, or some little elevation that would hold him in that position and near to the edge of the apron. The apron had upon its side, a plank about six or eight inches in height, and it had attached to this point near where his foot was on the outside, a chain which was attached to a weight in the chute that was used for drawing up the apron when they got ready to raise the apron up and to hold it up; that he placed his left leg upon the apron and placed his right leg over the side of the apron and from that point, reached up to a point about the middle of the apron where it was connected with the chute and where some coal had lodged, for the purpose of removing the coal and coal dust so that the apron would go up to its place without any obstruction, and that just as he had leaned over in that position, and while he was in the act of so removing the coal, Lewis suddenly backed the locomotive and his right limb was caught between the top of the cab, or the corner of the cab, perhaps, and the side of the apron and his knee was crushed.

There is conflicting testimony as to how the locomotive came to be started. Mr. Lewis contends in his testimony strongly, that he received notice from Mr. Sutherland that the locomotive should be moved. Sutherland denies that he gave any notice of that kind, but says the movement was voluntary upon the part of Mr. Lewis.

The injury occurred, however, but the position of the parties is used as an argument for the purpose of showing that the plaintiff had been guilty of some negligence himself in the matter, and in part, for the purpose of showing that Mr. Sutherland is not correct in his statement in regard to the position he occupies; for it is contended upon the part of the railroad company, that Mr. Sutherland was, at the time, seated on the top of the cab with his feet hanging over, as we understood, and that he had stated to parties that he was in that position, and that in doing so, he had forgotten—that he had said that the apron had not been raised; it had passed from his mind momentarily, and that when the locomotive moved back, his limb was caught. The testimony of the physician who attended him afterwards and who assisted in the amputation of his limb, was given, wherein he states that Mr. Sutherland in detail told him that that was the position he was occupying at the time.

Some conclusions are endeavored to be drawn from that position—from the injuries that were received, as they appeared on the limb itself, to show that that

Railroad Co. v. Sutherland.

was the position that he occupied. That matter has been submitted to a jury and they have found in favor of the theory of Mr. Sutherland.

There was testimony given contradicting Mr. Sutherland's testimony, and testimony given to contradict the physician in his statement; indeed, the whole line of testimony ordinarily given in such a case, was resorted to, and the whole matter was submitted to the jury and with their findings of facts in that regard, we do not feel that there is any occasion to interfere.

The position of the party, so far as we can ascertain from the evidence and from the photographic maps that were exhibited to us, is as consistent with the theory of Sutherland as it is with the theory of the other party, and certainly there is no such weight of testimony against the theory of the plaintiff as would call for an interference upon the part of this court to disturb the verdict of the jury.

Upon the conclusion of the testimony, the defendant in error requested certain charges of the court and these charges are copied into the bill of exceptions for the purpose of presenting the question which is made and presented to the court, for the purpose of saving the view that the counsel has of the law of the case, and they are well framed for the purpose. The court, however, refused the charges requested, and charged the jury upon the theory of the law that is laid down by the Supreme Court of this state.

Without going into any of the details in regard to that matter, we are of the opinion that the charge of the court is substantially correct and we see no reason for disturbing the judgment in the case by reason of any error in regard to rejecting requests, or in regard to those directions upon the part of the court.

There is one matter here that perhaps should be referred to, and that is in regard to the matter that is set up in the second defense. It seems that the company had organized a sort of insurance company in which Sutherland had become a member as is claimed. That was offered in evidence, although not strenuously urged here by counsel, as we understand, for the purpose of showing that the plaintiff was not entitled to recover because of the stipulations or agreements contained in this association paper.

The particular clause that is referred to, is this: "As it is not contemplated in this scheme to give double benefits in cases of disability or death resulting from accidents, the benefits herein promised shall not be payable nor paid when the contributor or any person entitled to damages because of the accident to him, whether resulting in death or not, has or makes a claim against said company or any of the companies operating its branches or divisions (including the Chicago division), until there be first filed with the committee a release, satisfactory to them, releasing said companies from such damages, signed by all persons entitled to the same."

It is sufficient to say that there is nothing to show that the plaintiff, Sutherland, ever claimed any benefits under this policy or paper; that none was ever made to him, although there is an averment in the answer that the company tendered to him any damages that he might claim under this policy and that they had also furnished him certain medical attendance.

We think that cuts no figure in the defense of the case. It is, however, strenuously urged that this paper should have the effect of fixing the status of Sutherland in relation to the company, and to show that, instead of being the subordinate of Lewis, he was in fact, in another department, and subordinate to other persons. The application for membership is filled out evidently by Sutherland or by some party, and is signed by Mr. Sutherland, as he himself states in his testimony:

"The secretary of the B. & O. Railroad Employes' Relief Association: William Sutherland, of Chicago Junction, in the county of Huron, state of Ohio, aged 30, at present employed as a laborer in the machinery department of the Baltimore & Ohio, Railroad Co.

apply to be admitted a member of the Baltimore & Ohio Railroad Employes' Relief Association, hereby consenting to be bound by the rules of the association as herein set forth, which I have read (or have had read to me), and agreeing that, &c." This is dated January 17, 1882.

The testimony was rejected by the court and under the view that we have taken of the effect of the contract that was made between the parties, we are unable to see how this would have any material effect upon the relation of Lewis to Sutherland, in this case, or of Sutherland to the company.

We do not find that it appears but that, as a matter of fact, he was in the machinery department. He was hired by the master mechanic. That goes about as far as any testimony to show in what department he was engaged. He was engaged as a common laborer and was engaged by the master mechanic.

We are of the opinion, therefore, that the court did not err in ruling that out—that particular matter of evidence.

As I have already stated, the general items of evidence that have been offered are along the line of the respective theories of the parties and are to be governed by the views the court took in relation to these theories. We have carefully read this record from end to end and we have as carefully read the briefs of the respective counsel in the case, and while, as we have said. before, the case is not one that is entirely clear and free from doubt, yet in our view of the law of the case, and the facts of the case, our judgment is that the judgment of the court of common pleas should be affirmed, but without any penalty other than costs against the plaintiff in error.

*J. H. Collins*, for plaintiff in error.

*Charles Pratt* and *Walker & Severance*, for defendant in error.